**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

UNITED STATES OF AMERICA,

                 vs.                                 DECISION AND ORDER
                                               05-CR-6066 CJS

RALPH FORTE,

                          Defendant.

_____

## INTRODUCTION

This matter is before the Court on the defendant's motion to suppress tangible evidence. In that regard, an evidentiary hearing was held, at which one witness, Rochester Police Officer Carlos Santory, testified. Additionally, certain exhibits were received into evidence. The Court has now had a chance to consider both the testimony and exhibits. For the reasons discussed below,  defendant's application to suppress is denied.

## FINDINGS OF FACT

On February 2, 2005, Officer Carlos Santory was employed by the City of Rochester Police Department as a uniformed road patrol officer and, as of that date, had been so employed for six years.   On February 2, 2005, he was in fact working in a uniformed capacity. At approximately 6:30 p.m. on that date, Officer Santory was in his police vehicle in a  parking lot at Dewey and Lexington Avenues in the City of  Rochester.  At that time a male black citizen, who was approximately 35 to 40 years old, walked up to where Officer Santory was parked.  The male black was accompanied by his daughter, who appeared

1

to be between four and six years  old.  Officer Santory did not get the man's name. However, this individual informed Officer Santory that he had been driving and observed a group of male blacks arguing on Lexington Avenue. He also stated to Officer Santory that he had observed a male black who was part of the group waving a shotgun around, and that he was worried that someone was going to get shot or hurt. He further indicated to Officer Santory that he  observed one of the males, whom Officer Santory assumed was the male black who had been waving the gun, place the weapon in the trunk of an older model blue Nissan.  The man speaking to Officer Santory pointed down Lexington Avenue in an easterly direction where he had made these observations. After speaking with this individual, Officer Santory proceeded east on Lexington Avenue in the direction that the man had pointed. Officer Santory also contacted the police dispatcher on his radio, to report a possible man with a gun in the area of Dewey and Lexington Avenues. Officer Santory drove  down Lexington Avenue at approximately 30 to 45 miles per hour, covering a distance of about a quarter mile, to the area of 263 Lexington Avenue.   At this time,  he observed a large group of blacks, about ten to fifteen people, mostly males,  to his right on the south side of Lexington Avenue.  As he approached, members of the group started to leave and it appeared to Officer Santory that  they were  trying to get away.   Officer Santory also noticed a vehicle in the driveway at 263 Lexington Avenue that generally  fit the description of the vehicle provided by the unidentified male black to whom he had just spoken.  However, the vehicle was not an older model blue Nissan, but an older model blue Toyota Camry. Additionally, as he approached 263 Lexington Avenue, Officer Santory observed the defendant, a male black,  about 15 feet from the vehicle walking from the front porch area of 263 Lexington Avenue toward the passenger side of the car. Officer

2

Santory then  watched as the defendant walked toward the rear of the vehicle.  Officer Santory saw that the  trunk of the Toyota was open, and he observed the defendant attempt to close it, but the trunk did not latch. Officer Santory continued to watch as the defendant walked around the back of the Toyota to the driver's door, and observed the defendant get into the car and start the engine. About twenty seconds elapsed from the time Officer Santory arrived in the vicinity of 263 Lexington to the time that the defendant got into the Toyota and started it up. Officer Santory stopped his police vehicle and directed the defendant to shut the car off and get out of the car. Officer Santory then got out of his vehicle and approached the defendant. As Officer Santory did so, he had his hand on his service weapon, although he did not have it drawn. The defendant did as directed, turned the car engine off, and got out of the Toyota. Further, upon Officer Santory's request, the defendant identified himself as Ralph Forte. Based upon the information Officer Santory had received concerning a firearm and based upon the fact that Officer Santory knew  that the location where the  encounter was occurring was a high crime area (about a week earlier Officer Santory himself had arrested somebody about a block away on a gun charge), he patted the defendant down to determine if he was armed with a gun. After determining that the defendant was unarmed, Officer Santory, who was alone at the time, placed him in the rear of his police vehicle. Officer Santory's police vehicle had a cage between the front and the back seats and the rear doors could not be opened from inside the car. Officer Santory can not recall whether he handcuffed the defendant before placing him in the rear of his police vehicle, but he may well have.  About the time he placed the defendant in the rear of his vehicle, Officer Santory was joined by two other members of the Rochester Police Department, a lieutenant and an officer.  After

3

the defendant was placed in the rear of his police vehicle, Officer Santory went to the rear of the Toyota to get the license number to determine who the owner was, so he could run a record check. When he did, Officer Santory observed that the trunk was almost completely open. He looked inside and saw, in plain view, the rifle depicted in Exhibit No. 2 in evidence. At the time he made this observation, Officer Santory was aware of a City of Rochester ordinance that required stored firearms to be equipped with a trigger lock or to be kept in a lock box. The rifle in the Toyota's trunk was not in compliance with this ordinance. However, while Officer Santory observed that the rifle neither had a trigger lock, nor was it in a lock box, the violation of the ordinance did not occur to him at the time of his observation and did not play a part in his initial detention and subsequent arrest of the defendant. Approximately a minute elapsed from the time that Officer Santory first encountered the defendant and told him to shut the car off until the time when Officer Santory observed the rifle in the trunk of the Toyota. After observing the rifle in the Toyota's trunk, Officer Santory proceeded to conduct a record check on the defendant. He learned that the defendant had a criminal record and was in fact on parole. At that time, Officer Santory placed the defendant under arrest and transported him to the Rochester Public Safety Building. The amount of time that elapsed from the point where Officer Santory placed the defendant in the rear of his police vehicle until he learned the defendant's prior record was some time under twenty minutes.

## ANALYSIS

The defendant contends that the firearm seized by Officer Santory on February 2, 2005 must be suppressed for two reasons. First, he argues that Officer Santory lacked reasonable suspicion to believe that he was involved in criminal activity, based upon

4

"information he received from an anonymous tip provided by a person who approached the officer on the street," which lacked any "indicia of reliability." (Memorandum of Law in Support of Defendant's Suppression, December 30, 2005, pp. 2-3.) Therefore, the defendant maintains that his stop by Officer Santory was illegal at the outset. Second, the defendant contends that even if Officer Santory 's initial investigative stop was legal, his subsequent detention exceeded lawful parameters and amounted to arrest on less than probable cause. Consequently, he argues the firearm must be suppressed, in any event, as the fruit of an unlawful arrest. On the other hand, the government argues against suppression, contending that Officer Santory's detention of the defendant, based upon reasonable suspicion, until the completion of the record check, was lawful both in its inception and its duration. Alternatively, the government argues that when Officer Santory observed that the rifle in the trunk of the blue Toyota was in violation of a city of Rochester ordinance, since it did not have a trigger lock nor was it in a lock box, reasonable suspicion ripened into probable cause. The Court determines, based upon its findings of fact and applicable law, that the government has established by a preponderance of evidence that both the stop of the defendant and seizure of the weapon were lawful.

## A.    Investigative Stop

In addressing the constitutionality of an investigative stop, the inquiry is twofold. First, a police officer's action must be "justified at its inception." *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Second, the officer's actions must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. If a police-citizen encounter exceeds the limits of a *Terry* stop, then the detention becomes an arrest that

must be supported by probable cause. *United States v. Hooper,* 935 F.2d 484, 494 (2d Cir. 1991). Therefore, the Court must first consider whether at the time Officer Santory stopped the defendant he had reasonable suspicion to do so, and second, even if he had reasonable suspicion for the stop, did the encounter retain its lawfulness prior to his discovery of the firearm.

### 1.    Reasonable Suspicion

Under *Terry v. Ohio*, and subsequent cases, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119 (2000). As the Supreme Court explained, "[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). In determining whether reasonable suspicion exists, a court must consider the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation and citation omitted). In short, "the determination of reasonable suspicion must be made on common sense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125.

6

However, reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors–quantity and quality–are considered in the "totality of the circumstances-the whole picture," *United States v. Cortez*, 449 U.S. 411, 417 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. *Alabama v. White*, 496 U.S. at 330. The question to be addressed is whether  the police had the "minimal level of objective justification" necessary for a *Terry* stop. *United States v. Sokolow*, 490 U.S. at 7. In other words, the standard for determining whether a particular stop was justified by reasonable suspicion is an objective one, not dependent on the intentions or motivations of the particular detaining officers. *United States v. Glover*,  957 F.2d 1004, 1010 (2d Cir. 1992)

 Relying on *Florida v. J.L.*, 529 U.S. 266 (2000), the defendant argues that the information given to Officer  Santory in the parking lot at Dewey and Lexington Avenues by the unidentified man did not meet the minimal level of objective justification necessary for a *Terry* stop, since it  essentially amounted to an anonymous tip unsupported by any indicia of reliability. However, the Court disagrees.  In *J.L.* the Supreme Court held that police officers lacked reasonable suspicion to make a *Terry* stop when an anonymous caller reported that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268. The Supreme Court explained that the precise issue before the Court was "whether the tip pointing to J.L. had [sufficient] indicia of reliability." *Id.* at 266. Finding the tip unreliable, the Court did not consider under what circumstances a reliable tip that someone was carrying a gun would provide the police with reasonable suspicion. Instead, the Court concluded, "[a]ll the police had to go on in

this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 271.

The facts of this case are clearly distinguishable from *J.L.* First, the information was not provided by an anonymous caller on the telephone. Rather it was provided to Officer Santory face to face by a citizen accompanied by his very young daughter. Consequently, Officer Santory had more reason to believe that the information was credible, since, "when an informant relates information to the police face to face, the officer has an opportunity to assess the informant's credibility and demeanor." *United States v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000). Moreover, citizens who personally report crimes to the police expose themselves to accountability for lodging false complaints. *Illinois v. Gates*, 462 U.S. 213, 233-34 (1983). In this case, it is significant to note that, while the black male was not identified, it was not because he refused to give his name to the police. Rather, Officer Santory never asked for his name. Both the Supreme Court and the Second Circuit have recognized the difference between in-person informants and anonymous telephone calls. See *Florida v. J.L.*, 529 U.S. at 276. (Kennedy, J., concurring) ("If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip. An instance where a tip might be considered anonymous but nevertheless sufficiently reliable to justify a proportionate police response may be when an unnamed person driving a car the police officer later describes stops for a moment and, face to face, informs the police that criminal activity is occurring."); and *United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir.1991) ("[A]

face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false."). Furthermore, in contrast to *J.L.*, where the informant did not explain how he came to possess the information he was providing, here the reporting individual told Officer Santory that he himself observed a group of males arguing on Lexington Avenue, observed one of the group, a male black, wave a shotgun around, and then observed one of the males place the weapon in the trunk of an older model blue Nissan, and then he pointed in the direction where he had made these observations. Also, the timing of the report to Officer Santory must be considered in evaluating the existence of reasonable suspicion. In that regard, the Supreme Court has recognized the greater weight carried by a witness's recent report. *Adams v. Williams*, 407 U.S. 143, 147 (1972). Finally, the motivation of the citizen informant in this case distinguishes it from *J.L.* The citizen who related the information to Officer Santory explained that he was doing so because he was worried that someone was gong to get shot or hurt. See  *United States v. Melvin,* 596 F.2d 492, 497 (1st Cir. 1979) (usual demonstration of credibility and reliability not required for non-accusatory statement of bystander witness).

Having determined that the information provided to Officer Santory by the male black  citizen was credible and reliable, the Court now turns its attention to whether objectively,  under the totality of circumstances test, Officer Santory, at the time he stopped the defendant, possessed reasonable suspicion to do so. As the district court of Connecticut observed in *United States v. Breckenridge*, 400 F. Supp. 2d 434, 439 (D. Conn. 2005):

> Reasonable suspicion may be based on a combination of a number of factors, including law enforcement's specialized knowledge and investigative inferences, personal observation of suspicious behavior, and information from sources that have proven to be reliable. *United States v. Nelson*, 284 F.3d 472, 478 (3d Cir. 2002) (citing *Cortez*, 449 U.S. at 417-19, 101 S.Ct. 690; *Terry*, 392 U.S. at 21, 88 S.Ct. 1868). It may also be based on the known or probable direction of the offender's flight, the number of persons in the area, the breadth of the geographic area, and information conveyed via police channels. Lafave, Search & Seizure § 9.5. Although each factor standing alone might carry little or no weight in the reasonable suspicion calculus, the "totality of the circumstances test" requires courts to consider all of the factors, together with an officer's specialized training, in making reasonable inferences. *Arvizu*, 534 U.S. at 275, 122 S.Ct. 744.

*Id.* at 439. Here, Officer Santory received reliable information from a citizen informant that he had been driving and observed a group of males arguing on Lexington Avenue and that one of the group, a male black, was waving a shotgun around.  He further related to Officer Santory, as indicated above,  that he  observed one of the males, whom Officer Santory assumed was the male black who had been waving the gun, place the weapon in the trunk of an older model blue Nissan, and he pointed down Lexington Avenue in an easterly direction where he had made these observations. After speaking with this individual, Officer Santory promptly proceeded east on Lexington Avenue in the direction that the man had pointed. Officer Santory drove  down Lexington Avenue for approximately thirty seconds to the area of 263 Lexington Avenue where he in fact observed  a large group of about ten to fifteen people, mostly males. As he approached, members of the group started to leave and it appeared to Officer Santory that  they were trying to get away.  Officer Santory also noticed a vehicle in the driveway at 263 Lexington Avenue that generally fit the description of the vehicle provided by the unidentified man

to whom he had just spoken.  Additionally, as he approached 263 Lexington Avenue, Officer Santory observed the defendant, a male black,  walk to rear of the vehicle and unsuccessfully attempt to close the trunk which was open. At that point, the Court concludes, by a preponderance of evidence, that based upon the totality of circumstances, Officer Santory had reasonable suspicion to conduct a *Terry* stop of the defendant, and that the facts available him at the moment he stopped the defendant would have warranted  a man of reasonable caution to believe that such action was appropriate.  *Terry v. Ohio*, 392 U.S. at 21; *United States v. Newton*, 369 F.3d 659, 673 -74 (2d Cir. 2004)

### 2.    Permissible Detention or *De Facto* Arrest

The defendant argues that even if his initial stop by Officer Santory was lawful,  the conditions in which he was subsequently held, prior to the discovery of the firearm, converted the permissible investigatory detention into a *de facto* arrest, requiring probable cause. Therefore, he maintains that, since there  there was no probable cause to arrest at the point the weapon was found, it must be suppressed as the product of an illegal seizure.

It is, of course,  well established that,

> [t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams*, 407 U.S. at 145-46 (citations omitted.) In that regard, both the stop and the inquiry must be "'reasonably related in scope to the justification for their initiation.'" *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (quoting *Terry*, 392 U.S. at 29). A permissible investigative stop may become an unlawful arrest if the means of detention are "more intrusive than necessary." *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993). A court must look to,

> (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons.

*United States v. Newton*, 369 F.3d at 674; *see also United States. v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) and *United States v. Perea*, 986 F.2d at 645. "'Although '[u]nder ordinary circumstances, . . . using handcuffs [is] not part of a *Terry* stop[,] intrusive and aggressive police conduct' is not an arrest 'when it is a reasonable response to legitimate safety concerns on the part of the investigating officers.'" *United States. v. Vargas,* 369 F. 3d at 102 (*quoting United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir.2001)). "It would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23.

The defendant argues, however, that "the extent to which [his] freedom of movement was restrained," *see id.*, brings this case within the orbit of *Florida v. Royer*, 460 U.S. 491 (1983). There, the Supreme Court found that a consensual inquiry was converted into an arrest, in part, because "the officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the *Terry* line

of cases." *Royer*, 460 U.S. at 504. In this case, the Court concludes that the defendant was not subjected to behavior that was more intrusive than necessary.

In reaching this conclusion, the Court, as directed by the Circuit, looks to the factors detailed in *Newton*, as set forth above. Officer Santory approached the defendant in a public area because he was investigating a report of a male black waving a shotgun. Further, Officer Santory was aware as he approached the defendant that the location where the  encounter was taking place was a high crime area, and in fact he himself, about a week earlier, had arrested somebody in the vicinity on a gun charge. The Court finds that it was objectively reasonable for Officer Santory, who  was at that point alone, to believe that the defendant was armed and posed a potential threat to him. Nonetheless, Officer Santory employed only minimal force. Officer Santory did not block the defendant's vehicle. Rather, he merely stopped his police vehicle near the defendant, directing him to shut his engine off and get out of his car. Officer Santory then got out of his vehicle and walked over to  the defendant. While he had his hand on his service revolver as he approached the defendant, he never actually drew his weapon. He proceeded to quickly identify the defendant, pat him down to make sure he was not armed,  and then secure him in the back of his  police vehicle to pursue his investigation. The Court concludes that Officer Santory's conduct in this regard, at a time when he was alone, was also, in the context of  the situation, objectively reasonable. Subsequently, after the arrival of two fellow officers, when Officer Santory went to get the license number of the blue car, he observed in the trunk, which was open, the firearm. He reacted to his observation of the rifle by promptly running a record check on the defendant, and within twenty minutes of his initial stop, Officer Santory learned that the defendant was on

13

parole, at which time he placed the defendant under arrest.[1]

As to the time period of under twenty minutes that the defendant was detained prior to his arrest, the Court, on the facts of this case, rejects the argument that such period was too long. Although "the length of the detention may be so excessive as to convert it into an *de facto* arrest, there is no outside time limitation for a permissible *Terry* stop. *United States v. Place*, 462 U.S. 696, 708-09 (1983) In determining whether what began as a lawful *Terry* stop remained a lawful detention or became a *de facto* arrest, a court must consider "[w]hether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). In making this determination, a court should not "'indulge in unrealistic second-guessing' as to the means law enforcement officers . . . employ to conduct their investigations." *United States v. Hooper*, 935 F.2d 484, 497 (2d Cir.1991) (*quoting Sharpe*, 470 U.S. at 686). Here the Court finds that Officer Santory did in fact diligently pursue his investigation. He made speedy and appropriate inquiries in a reasonable way. *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995).[2] His investigation did not "involve any delay unnecessary to [a] legitimate investigation." *United States v. Sharpe*, 470 U.S. at 687. In that regard, the defendant does not suggest that Officer Santory could have ascertained his status any more quickly. *United States v. Tehrani*, 49 F.3d at 61. Consequently, based upon the totality of the circumstances, the Court concludes by a

---

[1]Pursuant to New York State Penal Law § 265.01 (4), a person is guilty of the Class A misdemeanor of Criminal Possession of a Weapon Fourth Degree when "he possesses a rifle or shotgun and has been convicted of a felony or serious offense."

[2]In *Tehrani*, this Circuit declined to hold that a thirty minute detention was *per se* too long. *United States v. Tehrani*, 49 F.3d at 61.

preponderance of evidence that Officer Santory's detention of the defendant was lawful and did not amount to a *de facto* arrest, since it "last[ed] no longer than [was] necessary to effectuate [its] purpose . . . ." *Royer*, 460 U.S. at 500.

## B.  Probable Cause

As indicated above, the government maintains that when Officer Santory observed that the rifle in the trunk of the blue Toyota neither had a trigger lock, nor was in a lock box, his continued detention of the defendant was no longer dependent upon reasonable suspicion because, at that point , probable cause existed to arrest him for violation of a City of Rochester ordinance. On this issue, the government contends that, since Officer Santory was aware of the City of Rochester ordinance, the fact that  the violation of the ordinance did not occur to him at the time of his observation and did not play a part in his initial detention and subsequent arrest of the defendant, does not matter on the determination of probable cause. The Court agrees.

"Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949). Probable cause then, like reasonable suspicion, is an objective standard, turning on a objective assessment of a police officer's conduct at the time the of the challenged action, rather than on the  officer's actual state of mind. *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985).  That is, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action

does not invalidate the action as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 138 (1978). In other words, under this objective approach, an observed violation of the law establishes probable cause even if subjectively the police officer involved does not rely on the violation in detain a suspect. *United States v. Dhinsa*, 171 F.3d 721 (2d Cir.1999). *United States v. Harrell*, 268 F.3d 141, 148 (2d Cir. 2001).

§ 47-5 C (4) of the Charter and Code of the City of Rochester ("Code") provides:[3]

No person shall possess a loaded or unloaded firearm, rifle, shotgun or air gun, or a dagger, dangerous knife, dirk, razor or stiletto, in a public place or public facility in the City. This prohibition shall not apply to:

(4)    A person transporting a rifle or shotgun in a motor vehicle in the City in accordance with the provisions of § 11-0931, Subdivision 2, of the New York State Environmental Conservation Law, or otherwise transporting an unloaded rifle, shotgun or air gun in the City, provided that the same is completely enclosed or contained in a nontransparent carrying case and either:

(a)    Said carrying case is locked; or

(b)    A locking device is attached to the weapon and locked in a manner so as to prevent the weapon from being fired.

Moreover, according to § 47-5 O of the Code, a violation of subsection C is "punishable by a fine not to exceed $1,000 or by imprisonment not to exceed 180 days, or by both such fine and imprisonment."

---

[3]The Court may take judicial notice of state statutes. *Lamar v. Micou*, 114 U.S. 218, 223 (1885).

16

The Court concludes that when Officer Santory observed that the rifle in the trunk of the blue Toyota was not secured in a locked carrying case and did not have a trigger lock, probable cause existed to arrest the defendant for a violation of Code § 47-5 C. The *Terry* stop, which the Court has determined, as detailed above, was objectively reasonable in its inception, was then approximately one minute in duration (the time that elapsed from the point that Officer Santory first encountered the defendant and told him to shut the car off until the time when Officer Santory observed the rifle in the trunk of the Toyota). Based upon its previous analysis of the *Newton* factors, and having concluded that a *Terry* detention of under twenty minutes was permissible, the Court obviously concludes by a preponderance of evidence that the defendant's detention for one minute, based upon reasonable suspicion, was clearly lawful.

## CONCLUSION

Accordingly, defendant's motion to suppress tangible evidence (Docket # 7) is denied in all respects.

It is So Ordered.

DATED: January 30, 2006
        Rochester, New York

ENTER.

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Court